UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BRENDA McCULLOCH,

        Plaintiff,

                                    Case Number 04-10126-BC

v.                                    Honorable David M. Lawson

METROPOLITAN LIFE INSURANCE
COMPANY,

        Defendant.

_____/

### OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO AFFIRM PLAN ADMINISTRATOR'S DECISION AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, Brenda McCulloch, originally filed this action in the Midland County, Michigan circuit court challenging the decision of the defendant, Metropolitan Life Insurance Company, denying her claim for long-term disability benefits both initially and on appeal. The plaintiff claimed that she could no longer perform her occupation because of lower back pain and degenerative disc disease. The defendant removed the matter to this Court on May 6, 2004 because the long-term disability plan at issue is subject to the provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* After the administrative record was served, the defendant filed a motion to affirm the plan administrator's decision, and the plaintiff filed a motion styled as a motion for summary judgment, which the Court will construe as a motion to reverse the plan administrator. The Court has reviewed the submissions of the parties and finds that the relevant law and facts have been set forth in the motion papers and that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(e)(2).

The plaintiff argues that the defendant's denial of her long-term disability benefit application was arbitrary and capricious because it was the product of a conflict of interest, the defendant relied on a nurse consultant to review her medical records instead of a doctor, and the decision otherwise was not supported by substantial evidence. The defendant disputes each of these arguments. After reviewing the administrative record, the Court concludes that the defendant was justified in denying the benefits application because the plaintiff failed to submit evidence that established that she was disabled as defined by the plan. The decision to deny benefits was not arbitrary or capricious. Therefore, the Court will grant the defendant's motion to affirm the plan administrator and deny the plaintiff's motion for summary judgment.

I.

Plaintiff Brenda McCulloch was employed by the Kroger Company in various managerial capacities in several locations in Michigan and Kansas from September 7, 1985 until May 30, 2003. She alleges that she stopped working as a result of a back injury. At the time she stopped working, the plaintiff was the manager of a Kroger grocery store in Mount Pleasant, Michigan. As part of her job, the plaintiff was required in a normal eight-hour shift to sit for two hours, stand for two hours, and walk for the remaining four hours. She had to lift items that weighed up to twenty pounds occasionally, which the plaintiff estimates to have occurred about one-third of the time. As will be discussed in more detail below, toward the end of her term of employment, the plaintiff worked part time with restrictions until she stopped working altogether. Within a month, she filed a claim for long-term disability benefits on June 27, 2003.

The defendant, Metropolitan Life Insurance Company (MetLife), administers Kroger's long-term disability plan. Under the plan, Kroger agreed to pay benefits to disabled employees under the following circumstances:

> A.  Monthly Benefits
>
> You will be paid a Monthly Benefit, in accord with Plan Highlights, if we determine that:
>
> 1.  you are Disabled;
> 2.  you became Disabled while covered under This Plan
>
> Benefits will begin to accrue on the date following the date you complete the Elimination Period. Payment of the Monthly Benefit will start on the date one month after completion of the Elimination Period. Subsequent payments will be made each month thereafter. Payment is based on the number of days you are Disable during each one month period.

AR at 13. The plan defines disability as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.  during your Elimination Period and the next 24 month period, you are unable to earn more than 80 % of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Community; or
> 2.  after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

AR at 14.

The plaintiff began experiencing problems with her back in 1996 following an injury she sustained at work. The details of this injury are not described in the administrative record, but apparently it was severe enough to warrant microdiscetomy at the L5/S1 level in 1997. The plaintiff reported to Dr. Blake Bergeon, M.D., a treating rehabilitation specialist, that the surgery "had

-3-

essentially resol[ved] her radicular symptoms[.]" AR at 125.  Nonetheless, she "was left significant low back pain that has been persistent." *Ibid.*

According to the administrative record, the plaintiff did not complain to a physician of low back pain thereafter until 2002.  On March 8, 2002, she was seen by Dr. Keven Lee, D.O., whom she told that she underwent back surgery in 1997, still had low back pain, and otherwise had been experiencing left arm pain for two weeks.  Apparently, the plaintiff was also experiencing some bleeding from a previous colonoscopy.  AR at 110.  Dr. Lee's records are mostly illegible, but the plaintiff states he diagnosed lower back pain and diverticulosis.  He also prescribed medication and a brace for the left elbow and wrist.

The plaintiff followed up with Dr. Lee on April 5 and 25, 2002, although the substance of these appointments is unclear: Dr. Lee's handwriting is illegible and the plaintiff does not explain what happened.  On April 15, 2002, the plaintiff began physical therapy at Dr. Lee's suggestion.  During the initial session, Dr. Lee noted the following goals for therapy:

1.  Decrease the tingling in the left forearm.
2.  Increase the strength of the left hand.
3.  Decrease the pain in the left shoulder.
4.  Decrease the trigger point in the left infraspinatus.
5.  Decrease the muscle tone of the left rhomboid major, levator, and upper trapezius muscle.
6.  Improve the strength of the left shoulder internal rotators, external rotators, and abductors.

AR at 137.  Dr. Lee reported improvements on April 29, 2002 after five sessions.

On this date pt states that her left elbow is without pain but there is only mild tightness remaining within the left wrist extensor muscles following trigger point injections which occurred in the left elbow on 4-26-02.  In respect to the upper trapezius and thoracic area on the left she has very minimal complaints of pain.

AR at 139.

-4-

On May 6, 2002, the plaintiff finished her course of physical therapy.  Dr. Lee noted in the plaintiff's medical records that "her elbow felt significantly good following trigger point injections which she had received . . . on 4-26-02." AR at 141.  Her pain was reduced to an "occasional pin point type of prick in the left elbow ." *Ibid.*   As for objective findings, Dr. Lee wrote,

> [t]he pt presents to [therapy] ambulatory and without any significant gait deviations. She is able to move through all transitional movements without difficulty.  Muscle testing of the left shoulder region is as follows: Internal rotation 4, external rotation 5, abduction 4, extension 5, and adduction 5.  Her grip strength is as follows left 52lbs, right 60lbs.  Palpation in the left shoulder does reveal spasms in the left infraspinatus, left upper trapezius, and left rhomboid muscles with slight trigger points present which are inactive.  The OA joint is tight.  Cervical anatomical ROM is well WFL [within functional limits] but there is mild tightness occasionally with the OA joint on the left.  Physiologically, there is decreased joint mobility at C2, C7, T3 and T10 with muscle spasms along the cervical and thoracic paraspinals.  Her manual cervical traction is WFL.  The ROM and strength of the left elbows are WFL. The pt is independent in performing her stretching exercises . . . .

AR at 141.  Although in Dr. Lee's view the plaintiff had made "significant progress," he was concerned that the plaintiff was discontinuing physical therapy because of "financial concerns." *Ibid.*

The plaintiff followed up with Dr. Lee on October 28, 2002.  During this visit, she complained of "pain in lower back – cramping in legs – wakes her up at night and sometimes during week – top of right foot numb." AR at 113.  The plaintiff further reported that she could not complete a part-time work schedule.  Dr. Lee prescribed certain medications including Celebrex.

The plaintiff reported that her pain worsened after she picked up a case of liquor at work, and she returned to Dr. Lee on January 7, 2003.  Dr. Lee's notes indicate that the plaintiff complained of "pain in the lower right quadrant" for the past three weeks that increased with straining.  AR at 115. The plaintiff also stated that she had been experiencing irregular bowel movements.  Dr. Lee's

notes otherwise are illegible, but the plaintiff says she was diagnosed with right-sided sciatica. Dr.

Lee apparently questioned whether a hernia might be involved.

By January 28, 2003, the plaintiff's pain had not abated. She saw Dr. Lee and complained

of pain in the lower right quadrant. Although Dr. Lee's notes again are not decipherable, the

plaintiff states the following occurred during the visit:

> Her major complaint related to pain in the lower quadrant, lower back pain, and right
> side sciatica. The doctor performed a physical examination noting SEF at 40 degrees
> or less, FLR limited on the right to 30 degrees or less, increased pain in the lower
> back and a Patrick/Faber Test and a Yeoman's Test that were positive on the right.
> The treatment plan at this point was to continue medication and if there was no
> improvement, to consider an M.R.I. and a referral.

Pl.'s Mot Judgment Admin. Record at 5.

The plaintiff followed up with Dr. Lee on January 29, 2003 and February 5, 2003. No

improvement was reported, and Dr. Lee scheduled an MRI. On February 10, 2003, the plaintiff

underwent the procedure. A report of the findings from the examination included the following:

> There is a disk space narrowing and disk disiccation at the L5-S1 disk level with
> degenerative changes of vertebral endplates noted as well. There is no evidence of
> recurrent disk herniation. Some enhancement of the inferior L5 vertebral body and
> endplate noted likely degenerative. No significant enhancement of the intervertebral
> disk space or abnormal T2 hyperintensity at the L5-S1 disk level noted to suggest
> infection. The remaining lumbar intervertebral disks appear unremarkable. The
> spinal canal and neural foramina are of adequate size. No other abnormality noted.
>
> Degenerative changes at the L5-S1 disk level. No focal disk herniation or spinal
> canal stenosis noted.

AR at 123.

Thereafter, the plaintiff was referred for treatment to Dr. Bergeon, who conducted an initial

examination of the plaintiff on February 25, 2003. Dr. Bergeon recorded the following in his notes:

> She has had some exacerbation of her pain since October [2002]. She is really not
> able to identify specific precipitating event but then in December she was again

> lifting at work, lifting a case of liquor and had some increased groin pain, but at any rate she has had progressively worsening pain since December. She had some chiropractic manipulation and a trial of physical therapy . . . and she was not able to tolerate the therapy and actually had exacerbation of her pain associated with it.
>
> Currently she rates her pain as intermittently severe. She has exacerbation of her pain with coughing or sneezing, with extended standing at work. She does have some relief with Skelaxin and Bextra.

AR at 100. He further noted that the plaintiff "was able to walk easily on heels and toes, squats and recovers with some difficulty and antalgia." *Ibid.* The plaintiff experienced no range of motion irritability to her hip. At the same time,

> [s]he does have a positive FABER's maneuver bilaterally, more marked on the right then [sic] the left. She has negative straight leg raising with increased back pain. She has tight hamstrings bilaterally. She has no percussion tenderness over the spinous process but has exquisite tenderness to palpation over the SI joint bilaterally, greater on the right then [sic] the left. She has hip abductor muscle tenderness and greater trochanteric tenderness. Abdomen is moderately obese, soft and nontender. There is no lymphadenopathy. Skin is normal to inspection and palpation. Peripheral pulses are 2 + and regular. She has normal strength in all myotomes in the lower extremities. Deep tendon reflexes are brisk and symmetric. Toes are down going bilaterally. There is no clonus. Sensation is normal in all dermatomes.

*Ibid.* Dr. Bergeon's suspected that the plaintiff's ailment was "primarily mechanical back pain. I do suspect there is a component of sacroiliac dysfunction." AR at 99. Further, he thought "there may be a component of superimposed radiculopathy based on intermittent radiating pain." *Ibid.* He ordered electrodiagnostic testing and arranged for physical therapy for the plaintiff. He also restricted the plaintiff's work, but the record is silent as to the details of the restrictions. However, based on some of the doctor's comments set out below, the Court infers that the restrictions included some limitation on lifting and, perhaps, positional limitations as well.

The plaintiff followed up with Dr. Bergeon on March 3, 2003. Dr. Bergeon noted that "she is doing reasonably well, tolerating work within her restrictions. She does note increased symptoms

with extended standing if she does so at work." AR at 99.  The plaintiff was to "continue with the
PT efforts and I . . . plan on seeing her back again in another month.  In the meantime, we will
continue with her work restrictions as previously indicated." *Ibid.*  Once again, however, there is no
description in the record of the restrictions.

Physical therapy apparently offered some improvement.  When the plaintiff returned for
follow-up on April 4, 2003, Dr Bergeon wrote that "she is having some improvement with the PT
but remains symptomatic with symptoms on the RT greater than the LT, radiating into the buttock
and occasionally into the posterior thigh." AR at 98. The plaintiff rated her pain as five out of a
possible ten.  The plaintiff had been off work and felt better with rest.  Dr.  Bergeon also indicated
that he "would go ahead with a trial of epidural injections." *Ibid.*  In the interim, the plaintiff was to
continue with her (undescribed) work restrictions and physical therapy.

The epidural injections helped the plaintiff's back pain, at least to some extent.  On May 21,
2003, Dr. Bergeon noted during a follow-up visit that "[h]er pain is markedly improved after the
epidural injections.  She does have increased symptoms with activity, extended standing or bending.
She had not been doing any significant lifting." AR at 97-98.  Dr. Bergeon further noted:

> I do feel that Brenda has a fairly chronic problem secondary to the DDD
> [degenerative disc disease].  Obviously if she would pursue more aggressive
> treatment, surgical intervention and fusion, she would not be able to return to heavy
> physically demanding work.  I feel that her best option at this point is to continue
> with the restrictions on a permanent basis, try and moderate her activity to some
> degree and hopefully she will have long term good outcome after the injections and
> with continuation of an exercise program.  I will plan on seeing her back again on
> an as needed basis.

AR at 97.

The plaintiff returned to Dr. Bergeon on June 3, 2003, apparently in considerable pain.  Dr.
Bergeon noted, "She has had recurrent pain after return to work.  Her pain is quite intense at this

point.  She has been unable to tolerate work.  She is tearful during the examination." *Ibid.*  The examination, however, was "otherwise unremarkable."  Dr. Bergeon expressed his opinion that the plaintiff "should undergo vocational counseling.  She is involved with the Comprehensive Back Program and I would [like] Laurie Miles to discuss options with her in terms of what may be available in that regard." *Ibid.*

On June 27, 2003, the plaintiff submitted to her employer an application for long-term disability benefits.  In her application, she stated that her disability was due to an injury or accident, but declined to provide details of the injury and accident, and the date the disability began.  According to the plaintiff, she was prevented "from performing the duties of her job" because Kroger did not "have . . . sit down positions."  AR at 79.  She listed Dr. Bergeon and Dr. Lee as her treating physicians.

The plaintiff further reported that she had completed highschool and possessed an emergency medical technician certificate.  The EMT certification was obtained through Butler Community College in 1985.  The plaintiff also stated that she took a business management correspondence course through Cornell University in October of 1998.  A resume attached to the application for disability benefits indicated that the plaintiff was skilled in balancing books, proficient in Microsoft Word and Lotus, and skilled in problem solving, filing, reconciling bank accounts, customer service, data entry, mailing monthly statements, and payroll.

In addition, the plaintiff completed a form entitled "Activities of Daily Living," which she submitted as part of her application.  She listed as physical limitations "weight limit 5 [pounds] or less, sit down, no repetitive bending/twisting."  AR at 87.  She described her daily routine in these terms: "breakfast, shower, computer, walk in yard, dishes, TV, nap, laundry, walk, sit, prepare

-9-

dinner, TV, exercise bike, TV, bed." *Ibid.* The form also asked the plaintiff to describe the house work she performed and how her disability impacted her ability to complete household chores. The plaintiff related that she was able to do laundry three times a week, dust, and do the dishes daily. However, she was no longer able to "scrub floors and bathroom, change sheets, and wash walls high area." *Ibid.*

Dr. Bergeon completed an "Attending Physician Statement" in support of the plaintiff's application for long-term disability benefits. He indicated that the plaintiff is "able to work with permanent restrictions." AR at 92. He diagnosed the plaintiff with "low back pain; DDD." *Ibid.* Treatment, he wrote, was "conservative" and included "PT, meds, voc[ational] rehab[ilitation]." He left blank sections of the form entitled "Psychological Functions," "Physical Capabilities" and "Cardiac." Dr. Bergeon attached a list of the plaintiff's permanent restrictions to his statement. The restrictions limited the plaintiff to a sit-down job and lifting to five pounds or less. AR at 101. His office notes and those of Dr. Lee, described above, also were submitted in support of the plaintiff's claim.

MetLife, the disability plan administrator, denied the plaintiff's application for benefits on October 24, 2003. The defendant wrote:

> We have completed our review for Long Term Disability Benefits and have found you are not eligible for benefits. In order to be eligible for benefits, you must meet the definition of disability as stated in the Kroger Company Plan.
>
> Your employer's plan states:
>
> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> > 1.   during your Elimination Period and the next 24 month period, you are unable to earn more than 80 % of your Predisability

2.  Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Community; or after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings

Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury.  Economic factors such as, but not limited to, recession, job obsolescence, paycuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

. . .

We have reviewed your entire claim, including the following information that was submitted:

- Disability Claim Employee Statement dated June 27, 2003
- Attending Physician Statement dated July 9, 2003 by Doctor Blake Bergeon
- Job Description dated August 31, 2003
- Offices notes dated February 5, 2003 to April 17, 2003 from Doctor Blake Bergeon
- Work Statis [sic] form dated June 9, 2003 from Doctor Blake Bergeon
- Radiology Report dated January 14, 2003
- Office visit notes dated March 8, 2002 to February 5, 2003 from Doctor Kevin Lee.

According to a phone conversation with your employer your date last work [sic] was May 31, 2003. After completion of the 90 day Elimination Period, the benefit start date would be no sooner than November 30, 2003 if approved.

A job description dated August 31, 2003 states that you are required to perform the following: 3 to 4 hours walking, 1 to 2 hours sitting, standing, and bending over in a regular 8 hour day.  The lifting and carrying requirements are 11 to 20lbs.  Occasionally.

As part of the claims process we had a nurse consultant review the medical in your file.  The Attending Physician statement . . . was reviewed.  Your initial office visit was February 25, 2003. Your most recent date of treatment was June 3, 2003.  Your primary diagnosis was low back pain and degenerative disc disease.  Subjective complaints included Low back pain.  The doctor referred Objective Findings to the "enclosed reports." It noted that he recommended "Conservative treatment, physical therapy, medications, and vocational rehabilitation." He also indicated that you were able to work with permanent restrictions . . . .

-11-

The work status report indicated the following permanent restrictions. Sit down job, Lifting limited to 5 pounds or less, and not repetitive bending/twisting.

A Radiology report of your left elbow and left wrist was conducted March 8, 2002. It noted that your left elbow had no evidence of acute fracture, dislocation, or aggressive pathology. Your Left wrist had no evidence of acute fracture, dislocation, or aggressive pathology involving carpal region.

Your initial evaluation with Dr. Lee was on April 15, 2002. You were treated for your left lateral epicondylitis of the humerus, left lower cervical, and thoracic pain with radiculopathy. He mentioned that X-rays taken of your left wrist and elbow were negative. He also noted that your shoulder had full anatomical range of motion. The results to the left shoulder muscle test are as follows: internal rotation 4/5, external rotation 4/5, abduction 4/5, extension 5/5, adduction 5/5. Your left grip strength was 41lbs and 60lbs on the right. Palpation into the left shoulder area revealed significant tenderness with multiple trigger points in increased tone of the left levator, upper trapezius, and the rhomboid major.

Dr. Lee recommended physical therapy 2 to 3 times a week for 4 weeks. You were treated through May 3, 2002 and discharged from care for left elbow epicondylitis.

The Nurse Co-ordinator concluded that the information provided in the file does not support sufficient medical [sic] that precluded you from performing your own occupation. Much of the medical information is from 2002 and the most recent information is from June 2003.

Based on the information currently on file and in accordance with the terms of your Group Plan, your claim is denied. The medical [sic] at hand does not support functional limitation, impairments or objective medical [sic] that would preclude you from performing your duties as store manager through your Elimination Period and beyond your benefit start date of November 30, 2003.

AR 143-45. The letter also informed the plaintiff that she could appeal the denial of benefits to

MetLife within 180 days.

On January 17, 2004, the plaintiff wrote an appeal letter to the defendant. She stated that "I

have permanent restrictions from Dr. Blake Bergeon" and that Dr. Lee had "taken me off work on

my lower back condition, in January 2003." AR at 146. She further explained that she "did attempt

to go back to work from My 20th 2003 thru May 31 2003." *Ibid.* However, her "permanent

-12-

restrictions . . . required a sit down position from my employer.  Which I was informed that they do

not have sit down positions." *Ibid.*

On March 1, 2004, MetLife informed the plaintiff that its previous denial of her claim for

benefits was upheld on appeal.  The company stated:

> We have reviewed our entire claim file, including the information submitted on appeal.
>
> Our records indicated that you were employed with The Kroger Company since September 7, 1985. You held the position of Co-Manager as of you last dated worked of May 31, 2003.  Long Term Disability benefits effective date is November 30, 2003.
>
> An office note by Dr. Lee dated October 21, 2002 noted that you were being treated for lower back pain and sciatica, along with occasional right foot numbness.  Dr. Lee noted that you reported not being able to do physical therapy because your work schedule.
>
> Dr. Lee indicated in a note dated January 7, 2003 that your chief complaint was pain in the lower  right quadrant after picking up a case of liquid at work.  You were also experiencing irregular bowel movements.  Dr. Lee noted that laboratory results were within normal limits, KUB and upright film of the abdomen were also negative.
>
> You were evaluated again by Dr. Lee on January 28, 2003.  At that time, you were experiencing lower right quadrant pain, lower back pain, and right sciatica.  A MRI was ordered on February 5, 2003, which revealed degenerative changes at L5-S1 disk level with no herniation or canal stenosis. No other test results were submitted supporting a disability.
>
> A x-ray report dated April 23, 2003 revealed cervical disc space narrowing with slight thoracic lordosis and spurring.  There was no indication of chronic disabling condition.
>
> To assist in this review, an Internal Nurse Consultant reviewed your entire claim file on February 17, 2003.  The consultant noted that you are being treated for lower back pain and degenerative disc disease.  The consultant noted that diagnostic testing does not support the presence of acute findings that would impair a return to work after a short period of recovery.   The consultant indicated that there are no formal evaluations of your functional abilities such as a Functional Capacity Evaluation. Restrictions and limitations provided by your treating physician appear to exceed the objective evidence.  The consultant noted that no additional objective clinical

-13-

documentation was submitted on appeal. Therefore, the consultant concluded that there is no clinical documentation provided for review that would demonstrate your inability to perform your own occupation for any employer in your local economy.

We have determined that the medical documentation currently in the file does not support a disability as defined by your plan. Therefore, the original claim determination was appropriate.

AR at 158-59.

The plaintiff filed then filed her complaint in state court and the matter was removed on May 6, 2004.

## II.

The plaintiff challenges the denial of benefits under section 502(a)(1)(B) of ERISA, which authorizes an individual to bring an action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). She contends that the denial of her claim must have been the result of a conflict of interest arising from the authority of the plan administrator both to provide benefits and administer the claim. She also argues that the decision to rely on a nurse consultant to review the medical records, many of which were furnished by physicians, was arbitrary and capricious. Finally, she says that the decision to deny her benefits was not supported by substantial evidence because the administrative record establishes without contradiction that she cannot return to employment as a store manager at Kroger because her work restrictions collide with the physical requirements of the job as described by Kroger itself.

"[A] plan administrator's decision is reviewed 'under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Shelby County Health Care Corp. v. Southern Council of*

-14-

*Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933 (6th Cir. 2000) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  The parties in this case agree that the standard of review is the arbitrary and capricious standard.  This deferential review is appropriate when the ERISA plan at issue, as here, provides a clear grant of discretion to the plan administrator and the decision being appealed was made in compliance with plan procedures.  *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595, 597 (6th Cir. 2001).

The arbitrary and capricious standard of review "is the least demanding form of judicial review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (internal quotes and citation omitted). When applying this standard, the court must determine whether the administrator's decision was reasonable in light of the available evidence.  Although the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision was not arbitrary or capricious.  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000).  A decision reviewed according to this standard must be upheld if it is supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).  Substantial evidence supports an administrator's decision if the evidence is "rational in light of the plan's provisions."  *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).

The plaintiff first mentions a conflict of interest and suggests that this structural conflict might impact the standard of review.  It is undisputed that MetLife both funds the long term disability plan and passes on the benefits applications.  However, the presence of a conflict of

interest does not require relaxation of the deferential arbitrary and capricious review standard or mandate *de novo* review of the plan administrator's decision. *Marchetti v. Sun Life Assur. Co. of Canada*, 30 F. Supp. 2d 1001, 1007 (M.D. Tenn. 1998). Rather, the conflict of interest is a factor taken into account when evaluating the decision under the arbitrary and capricious standard. *Calvert v. First Star Finance, Inc*., 409 F.3d 286, 297 (6th Cir. 2005); *see also University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000). The mere existence of a structural conflict of interest is not enough to justify heightened scrutiny of the plan administrator's decision. The plaintiff must provide actual evidence that the conflict of interest had some effect on the administrator's decision. *See Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998). No such evidence was presented in this case.

The plaintiff next argues that, as a matter of law, MetLife's use of a nurse practitioner to review a claim for long-term disability benefits is arbitrary and capricious. She relies on statutory provisions under Michigan law governing the practice of medicine, which state:

> (1) An individual shall not engage in the practice of medicine or practice as a physician's assistant unless licensed or otherwise authorized by this article. An individual shall not engage in teaching or research that requires the practice of medicine unless the individual is licensed or otherwise authorized by this article.
> . . .
> (d) "Practice of medicine" means the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts.

Mich. Comp. Laws §§ 333.17011(1); 17001(1)(d).

This argument is unavailing for two reasons. First, even if state law governed in the determination of benefits under an ERISA-regulated plan, which it does not, the nurse consultant made no diagnosis or otherwise provided treatment for the plaintiff. Rather, the nurse consultant

-16-

reviewed the plaintiff's medical records and found that they did not support a finding of disability

as that term is defined in Kroger's long-term disability plan. Reviewing medical records and

providing an opinion to a third party does not amount to the practice of medicine.

Second, there is no requirement set forth in the plan or the decisional law of this circuit that

a medical doctor must review a claimant's medical records. In fact, the Sixth Circuit has specifically

rejected the argument that use of a nurse consultant instead of a physician was arbitrary and

capricious, albeit in an unpublished decision. In *Boone v. Liberty Life Assur. Co. of Boston*, 2005

WL 3479835 at *5 (6th Cir. Dec. 20, 2005) (unpublished), the court of appeals reasoned:

> Boone next argues that Liberty did not engage an independent physician to undertake
> an analysis of her claim but relied on a nurse (Terry) to do so. But this circuit has
> never held that a plan administrator must hire a physician to undertake an
> independent review of an applicant's records before denying benefits. *See, e.g.,*
> *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376 (6th Cir. 1996); *see also*
> *Wages v. Sandler, O'Neill & Partners*, L.P., 37 Fed. Appx. 108 (6th Cir. 2002). And
> the circuit has upheld the decision of a plan administrator where a nurse reviewed the
> medical evidence. *See Wages*, 37 Fed. Appx. at 110. At all events, Boone has not
> explained what reports and diagnoses submitted in support of her application would
> have been appreciated by a doctor but were beyond the ken of Nurse Terry.

In this case, the defendant properly relied on a nurse consultant for information about the

medical records and what they disclosed about the plaintiff's condition. As a matter of law, there

is no requirement that MetLife employ a physician to review the plaintiff's medical records. As a

matter of fact, there is no evidence to suggest that the reports the plaintiff submitted in support of

her application for benefits were beyond the nurse consultant's capability to review and interpret.

Although the plaintiff has raised these other issues, the crux of this case is whether there is

evidence in the administrative record to justify the defendants' actions in light of the applicable

review standard. In such an action, the court generally considers only that evidence presented to the

plan administrator at the time he or she determined the employee's eligibility in accordance with the

-17-

plan's terms. *Smith*, 129 F.3d at 863. The court's review therefore is limited to the administrative record. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998). The plaintiff insists that the physicians' statements in the administrative record establish without contest that she has work restrictions that are inconsistent with the requirements of her last job at Kroger. That indeed may be the case, but that fact alone does not necessarily mean that the plaintiff qualifies for disability benefits. Because "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue," *Firestone*, 489 U.S. at 115, the Court must turn first to the plan's definition of disability as the starting point.

The plan's definition of disability set forth above is phrased in terms of income and earning capacity, not physical restrictions. To qualify, a claimant must suffer from some "sickness, pregnancy or accidental injury," AR at 14, but that is not enough. In addition, a claimant must show that during the elimination period (which appears to be 180 days in this case) plus twenty-four months, she cannot "earn more than 80 % of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Community." *Ibid.* After that period, she must show that she cannot "earn more than 60% of your Indexed Predisability Earnings from any employer in your local Economy at any gainful occupation for which you are reasonably qualified." *Ibid.*

The denial of benefits in this case was not based on an exclusion of coverage or a condition disqualifying the claimant, for which the plan administrator would have the burden of proof. *See McCartha v. National City Corp.*, 419 F.3d 437, 443 (6th Cir. 2005) (holding that "[a]n ERISA plan, not the participant, has the burden of proving an exclusion applies to deny benefits") (citing *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir.2002)). Rather, the plaintiff's burden is spelled

out in the plan: "At your expense, you must provide documented proof of your disability." AR at 27. In such cases, the Sixth Circuit has held that the plaintiff in an ERISA benefits case bears the burden at all times in proving continuous disability as defined by the plan. *See Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991).

In this case, the defendant concluded that the plaintiff failed to establish that she was disabled within the meaning of the plan. Indeed, the plaintiff offered no evidence in the administrative record of her earning capacity. As the nurse practitioner found, there was no evaluation of the plaintiff's functional capacity. *See* AR at 159 (stating that "there are no formal evaluations of your functional abilities such as a Functional Capacity Evaluation"). In addition, no evidence of the plaintiff's ability to earn is present in the record. Certainly, there is evidence that the plaintiff suffered from low back pain, underwent surgery in 1997, had an MRI that revealed degenerative disc disease, and had permanent work restrictions. *See, e.g.*, AR at 101, 123, 125. However, the plaintiff's burden is to prove she is disabled within the meaning of the plan. Disability is not framed in terms of what the plaintiff does or does not suffer from. The plaintiff has presented no evidence of how her ailments impacted her ability to work and earn. She simply concludes that evidence of her ailments is sufficient to meet the definition of disability because there is no evidence in the record that managers at other area grocery stores have different physical requirements than Kroger.

The absence of evidence will not satisfy the plaintiff's burden of proof, especially when there is evidence that contradicts the inference the plaintiff seeks to draw. For instance, in the physician's statement, Dr. Bergeon states that the plaintiff is "able to work with restrictions." AR at 92. In addition, the record contains evidence that the plaintiff could perform a wide variety of functions

-19-

at home.  The plaintiff completed a form entitled "Activities of Daily Living," which she submitted as part of her disability application.  AR at 87.  She listed as physical limitations "weight limit 5 [pounds] or less, sit down, no repetitive bending/twisting." *Ibid.*  She described her daily routine in these terms: "breakfast, shower, computer, walk in yard, dishes, TV, nap, laundry, walk, sit, prepare dinner, TV, exercise bike, TV, bed." *Ibid.*  The form also asked the plaintiff to describe the house work she performed and how her disability impacted her ability to complete household chores.  The plaintiff related that she was able to do laundry three times a week, dust, and do the dishes daily. *Ibid.* However, she was no longer able to "scrub floors and bathroom, change sheets, and wash walls high area." *Ibid.*

Most damaging to her case, as the defendant points out, is that she submitted no evidence for consideration by MetLife of her condition after June 3, 2003, Dr. Bergeon's last office notation. The plaintiff must demonstrate that she is disabled on a continuing basis during the elimination period and thereafter.  A plan administrator that denies benefits on the basis that no evidence for the relevant period is submitted acts neither arbitrarily nor capriciously.  *See Miller*, 925 F.2d at 986.

A review of the administrative record leads inevitably to the conclusion that the plaintiff has failed to submit sufficient evidence of functional limitations and an inability to earn.  The Court must conclude, therefore, that the defendant did not act arbitrarily or capriciously when denying the plaintiff's benefits application.  Consequently, the Court will affirm the decision of the plan administrator.

III.

The Court finds that there is a reasonable explanation for the administrator's decision to deny benefits in this case in light of the plan's provisions and the evidence contained in the administrative record.

Accordingly, it is **ORDERED** that the defendant's motion to affirm the plan administrator's decision [dkt # 10] is **GRANTED**.

It is further **ORDERED** that the plaintiff's motion for summary judgment, construed as a motion to reverse the plan administrator's decision and award benefits [dkt # 9] is **DENIED**, and the plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson _____
DAVID M. LAWSON
United States District Judge

Dated: April 6, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 6, 2006.

s/Tracy A. Jacobs _____
TRACY A. JACOBS

---

-21-